## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                                    Case No.:  2:07-cr-50-FtM-34SPC

CEDRICK O. FARMER

_____

### REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court on the Defendant's Motion to Suppress Evidence and Memorandum of Law (Doc. #21) filed on January 10, 2008.  The Government filed the Government's Response to Motion to Suppress Evidence (Doc. #24) on January 25, 2008.  A hearing was held before the Honorable Sheri Polster Chappell, United States Magistrate Judge on January 31, 2008.  The Government was represented by Assistant United States Attorney, Jeffrey F. Michelland, the Defendant was present and represented by Assistant Federal Public Defender, Russell K. Rosenthal.  The Government called Officer Kevin Knick of the Fort Myers Police Department (FMPD), Ofc. Grace Rene Towler, FMPD, and Detective William Murphy, FMPD.   The Government also introduced ariel photos of the Lime Street location. (Gov't Ex. 1, 1A). The Defendant called Ofc. Maalisa Langton, FMPD.

### TESTIMONY AND EVIDENCE

**Officer Kevin Knick**: (Tr. 5-78)

        Ofc. Knick has served with the FMPD for approximately two years, and prior to that, with the United States Coast Guard for five  years.  (Tr. 5:17-24, 45:19-21).  He is currently assigned to

FMPD's Violent Crimes Unit Task Force and performs road patrol duties.  (Tr. 6:4-8).  He began his duties with FMPD on July 7, 2006. (Tr. 6:14-18).

On September 21, 2006, at approximately 9:00 a.m., Ofc. Knick was on road patrol field training with Ofc. Maalisa Langton.  (Tr. 7:1-5, 45:22-24).  He had been on the job with FMPD for approximately two months.  (Tr. 7:8-14).  Ofc. Knick was driving a marked patrol vehicle and Ofc. Langton was the field training officer.  (Tr. 7:21-22).  Ofc. Knick received a dispatch to investigate a vehicle parked on the roadway at 2665 Lime Street in Fort Myers.  (Tr. 8:4-8).  Ofc. Knick testified that he had been patrolling that area for less than a month but was familiar with the neighborhood and knew the area was a high crime area.  (Tr. 8:18-25, 9:1-9, 46:17-19).  He testified that there were a number of violent crimes in that area.  (Tr. 9:15-16).  Ofc. Knick defined violent crimes as robberies, shootings, narcotics sales, and burglaries. (Tr. 9:19-23, 47:14-16).

When Ofc. Knick arrived at the Lime Street location, he observed a station wagon parked catty-corner in the street.  (Tr. 10:15-18).  The rear of the vehicle was about three feet away from the curb into the westbound lane with the front of the vehicle located about a foot from the curb.  (Tr. 10:19-25, 11:1-13, 13:18-19 ).  Ofc. Knick stated that he could walk completely around the vehicle and still be on the blacktop.  (Tr. 11:14-17).   Ofc. Knick testified that while traffic could park on Lime Street,  the Defendant's vehicle impeded the flow of traffic and it would have been difficult for a car to pass. (Tr. 17:21-23, 18:20-21).  The vehicle was parked in such a way that other vehicles would have had to go beyond where they normally would drive.  (Tr. 64:10-15).  If it had been parked legally, both vehicles would be able to  pass each other.  (Tr. 64:18-25).  On cross examination, Ofc. Knick indicated that he did not take any measurements of where the vehicle was parked and never issued a citation for the infraction.  (Tr. 62:25).

Ofc. Knick parked his patrol car up against the curb behind the Defendant's vehicle. (Tr. 20:4-5) He stated that he did not use the patrol car's lights or siren. (Tr. 20:6-9). After arriving on the scene, Ofcs. Knick and Langton approached the vehicle to make contact with its occupants. (Tr. 20:1-3). While they were approaching the Defendant's vehicle, the backup officer, Ofc. Grace Towler, arrived on the scene. (Tr. 20:10-18). Ofcs. Knick and Langton approached the driver's side of the vehicle, and knocked on the window. (Tr.21:1-6). Ofc. Knick noted the Defendant and a passenger were asleep in the vehicle. (Tr. 21:7, 49:6). Ofc. Knick testified that he could see through the windows and observed the vehicle was loaded with TV's and stereo equipment. (Tr. 21:518-19). Ofc. Towler approached the passenger side of the vehicle. (Tr.21-23-24).

The Defendant rolled down the window and Ofc. Knick asked him for proof of identification. (Tr. 22:4-12). Normally he would ask for driver's license, proof on insurance, and registration. (Tr. 51:7-8) However, he does not recall whether or not he asked those specific questions on this occasion or not. (Tr. 50:14-17). The Defendant provided a Florida ID card. (Tr. 22:15-16, 50:19). Ofc. Knick retained the ID throughout the contact with the Defendant. (Tr. 55:19-25). While Ofc. Knick and Langton were speaking with the Defendant, Ofc. Towler was speaking with the passenger and requesting her identification. (Tr.23:3-8). The passenger was identified as Donnalee Daye. (Tr.23:9-11). Ofc. Knick did not determine where the Defendant lived. (Tr. 54:6-23, 55:2-3).

The Defendant and the passenger were covered with a blanket. (Tr. 23:18-19, 49:4-6). Ofc. Knick testified he could not see their hands or what they were sitting on. (Tr. 23:19-20). Therefore, for officer safety, he asked if there were any weapons in the vehicle. (Tr. 23:13-17). According to Ofc. Knick, he learned to ask if an individual had a weapon during his officer training. (Tr. 23:21-24). As grounds for his safety concerns, Ofc. Knick stated there were two people in the car, which

causes more concern than one person, the car was loaded down with electronics, and the car was located in a high crime neighborhood. (Tr. 24:8-25,25:1-12). Ofc. Knick stated "if they had a weapon they could use it against us." (Tr. 25:4-5).

In response to Ofc. Knick's question regarding a weapon, the Defendant indicated he had a knife under the seat. (Tr. 25:13-18). This further heightened Ofc. Knick's safety concerns. (Tr. 25:19-21). At that point, the officers had the Defendant and his passenger step out of the vehicle so they could attempt to locate the knife. (Tr. 25:22-24). The officers then preformed a protective sweep of the vehicle for the weapon. (Tr. 26:3-4). Ofc. Langton was looking under the driver's seat for the knife while Ofc. Knick stayed at the rear driver quarter of the vehicle with the Defendant. (Tr. 26:6-11 ). Ofc. Knick placed himself between Ofc. Langton and the Defendant while she was searching under the seat. (Tr. 26:14-15). The Defendant was not handcuffed and Ofc. Knick's weapon remained in its holster. (Tr. 26:12-18). The Passenger was with Ofc. Towler at the front passenger tire of the vehicle. (Tr. 26:22-25).

Ofc. Langton did not find the knife so she asked the Defendant where the knife was located and if there were any other weapons in the vehicle. (Tr. 27:1-9). The Defendant mumbled his response and Ofc. Langton went back to search the vehicle a second time, but could not find the knife. (Tr. 27:11-12). Once again, the officers asked about the weapon and the Defendant mumbled what sounded like the word "gun." (Tr. 27:15-23). Ofc. Langton asked the Defendant "what gun?" (Tr. 27:25). The Defendant said "the cap gun underneath the front passenger seat." (Tr. 28:1-2). Ofc. Knick stated that the officers had continuing concerns as to what type of weapon was underneath the seat. (Tr. 28:3-10). Although Ofc. Knick was not sure what was in the vehicle, he felt there was something else in the car. (Tr. 28:8-10). Ofc. Knick maintained that he was concerned for their safety

especially since the Defendant was mumbling, and was not being straight with them. (Tr. 28:11-17). Ofc. Knick surmised there could have been a concealed weapon without proper permit which violated a State statute. (Tr. 28:18-23, 29:1-2). Ofc. Knick acknowledged on cross examination that the statement the Defendant made in regard to the knife and gun was after the Defendant was already detained and not free to leave since they were investigating an illegal parking of a vehicle. (Tr. 56:7-20).

With two people outside the vehicle and a possible firearm in the vehicle, Ofc. Langton then detained the Defendant by placing him in handcuffs in the back of her patrol car. (Tr. 29:7-16). However, the Defendant was not placed under arrest and his <u>Miranda</u> rights were not read. (Tr. 29:11-24). Ofc. Knick informed the Defendant that he was not under arrest but only being detained for his safety and that of the officers. (Tr. 30:19-25, 31:1-6).

Ofc. Knick testified the Defendant's passenger, Ms. Daye, was still with Ofc. Towler. (Tr. 31:7-12). He saw Ofc. Towler search Daye's purse and find a glass pipe that appeared to be blackened on both ends with charred mesh which he knew to be consistent with smoking drugs. (Tr. 31:11-25, 32:1-25, 33:1-17). Daye was then placed under arrest for possession of paraphernalia. (Tr. 34:1). Ofc. Knick believed that all of this occurred prior to the search of the vehicle. (Tr. 34:5-7). At that point in time, Ofc. Knick went to the driver's side of the vehicle, Ofc. Towler went to the passenger side of the vehicle. (Tr. 34:8-14). He looked under the seat but did not locate a knife. (Tr. 35:1-2). He observed a pillow between the driver and passenger seats. (Tr. 35:2-4). Once he moved the pillow out of the way, he saw the barrel of a shotgun facing out. (Tr. 35:4-6). He left the shotgun in place and told Ofc. Langton. (Tr. 35:7-10) Ofc. Towler located a revolver-type weapon under the passenger seat. (Tr. 35:12-14). He took possession of the shotgun and

cleared it.  It was unloaded.  (Tr. 35:19-22).  Ofc. Towler took possession of the revolver.  (Tr. 35:24).  She was unable to open it to clear it and could not determine what kind of gun it was at the time.  (Tr.36:2-6).

After determining the Defendant was a convicted felon, the Defendant was placed under arrest for Possession of a Firearm by a Convicted Felon.  (Tr. 37:1-6).  Based upon a review of the computer log, Ofc. Knick determined that approximately 15 minutes elapsed from the time of the stop until the firearm was located.  (Tr. 38:10-25, 39:1-5).

Ofc. Knick read the Defendant his <u>Miranda</u> warnings from a prepared card.  (Tr. 39:12-24, 69:3-7).  Ofc. Langton was present.  (Tr. 69:8-10).  The Defendant was sitting in the police car and Ofc. Knick was standing next to the car speaking through the window.  (Tr. 41:14-16, 69:13-18).  The Defendant  was not asked to execute a waiver form at that time.  (Tr. 69:21-23).   Ofc. Knick does not recall whether the Defendant verbally responded or just shook his head but that he implied he would answer questions. (Tr. 72:15-17).   He neither forced nor coerced the Defendant into making a statement, nor did he promise him anything.  (Tr. 44:19-25, 45:1-2).  The Defendant acknowledged that he knew both weapons were in the vehicle, and that the revolver was his and the shotgun was given to him. (Tr. 42:15-25, 43:1-24).   The Defendant was transported to the Fort Myers Police Department to speak with a detective, and his vehicle was towed. (Tr. 44:1-2).

**Officer Grace Towler**: (Tr. 78-108)

Ofc. Towler has been with the Sanibel Police Department since June of 2007.  (Tr. 78:21-25).  Prior to that, she was a road patrol officer with the FMPD from June 2004 until November 2006, and was a corrections officer for two and one half years prior to that.  (Tr. 79:1-18).

On September 21, 2006, she responded as a backup officer to 2665 Lime Street, in Fort Myers.  (Tr. 79:21-25, 80:1-3).  When she arrived at that address, she noted a vehicle parked "slanted" or at an angle on the side of the street.  (Tr. 81:2, 22-24).  At the hearing, she recalled the vehicle being parked westbound on Lime Street with the rear tires closest to the edge of the roadway.  (Tr. 82:17).  Her recollection was that you could not have walked around the vehicle without stepping off the paved roadway. (Tr. 104:14-18).

Ofc. Towler approached the passenger side of the vehicle.  (Tr. 83:1).  She noticed two people sleeping in the vehicle and attempted to make contact with the passenger.  (Tr. 83:3-6).  Ofcs. Langton and Knick were making contact with the driver.  (Tr. 83:15-17).  She spoke with the female passenger.  (Tr. 83:18-22).  It appeared to Ofc. Towler that the female was digging on the floorboard for her purse, moving around attempting to hide something.  (Tr. 84:6-9).  This drew her attention, and for officer safety she made sure that she was watching what the female did with her hands.  (Tr. 84:10-12).  Ofc. Towler asked the passenger who was identified as Donnalee Daye to step out of the vehicle and then asked whether or not she had any drugs or weapons on her. (Tr. 84:16-22).  She asked if she could search her and her purse.  (Tr. 85:1-5).  Ofc. Towler searched Daye's purse and found what she knew in her training and experience to be a crack cocaine pipe.  (Tr. 85:16-25,86:1). Daye was placed under arrest for possession of drug paraphernalia. (Tr. 86:9-11).

Ofc. Towler recalls that during the encounter with the Defendant and passenger, Daye, the Defendant said something about a knife or weapon.  (Tr. 86:22-23).  Based upon the statement, a protective sweep of the vehicle was performed and firearms were found.    (Tr. 87:19-20).  Ofc. Towler searched the passenger side of the vehicle and found a pistol. (Tr. 87:23-25).

**Detective William Murphy:**   (Tr. 109-153)

Det. Murphy has been with the FMPD since April of 1993.  (Tr. 109:16-25, 110:1-2).  He was promoted to Detective in April of 2004.  (Tr. 109:20-22).  On September 21, 2006, he was assigned as a detective in the property crimes division.  (Tr. 110:3-10).  On that day, he was contacted by Ofc. Langton regarding an arrest of Cedrick Farmer for Possession of a Firearm by a Convicted Felon.  (Tr. 110 11-18).  He had contact with the Defendant four (4) hours after the Defendant was brought to the station.  (Tr. 111:7-9, 121:16-19).

Det. Murphy conducted a taped statement of the Defendant. (Tr. 111:10-12).  Det. Murphy asked the Defendant routine booking questions prior to going on tape, turned the tape recorder on, and read the Defendant his <u>Miranda</u> rights from a prepared form.  (112:15-24) (Govt. Ex. #4).  Det. Murphy read the section of the form dealing with the Defendant's rights, and read the Defendant to the portion of the form dealing with the issue of waiver of those rights.  (Tr. 124:6-8).  The Defendant signed the form as did Det. Murphy.  (Tr. 119:7-11).  He advised that he did not threaten or coerce the Defendant into waiving his rights, nor did he promise him anything.  (Tr. 118:16-23).  Det. Murphy testified that during the conversation the Defendant said "I am not giving up my rights or nothing, right?", at which time he reiterated the Defendant's rights.  (Tr. 120:16-18, 128:16-17).  In response to that, he reiterated his rights but did not ask him if he was prepared to waive his rights.  (Tr. 128:16-26, 129:1-3).

**Officer Maalisa Langton**: (Tr. 132 - 153)

Ofc. Langton has been with the FMPD for a little over four  years and is currently serving as a Detective.  (Tr. 132:9-13).  At the time of this incident,  she was Ofc. Knick's training officer on routine road patrol.  (Tr. 132:14-24).   On September 21, 2006, they were called to investigate a

suspicious vehicle.  (Tr. 134:9).  The vehicle was parked on a slant slightly obstructing the roadway. (Tr. 136:13-15).  The front end of the vehicle was facing the curb with the back end sticking out. (Tr. 148:3-5).  It was obvious to the sight that the car was improperly parked, however, she did not measure or photograph the vehicle's location.  (Tr. 152:4-15).  The way the vehicle was parked was in violation of state law because other vehicles would have had to go around it.  A citation was never issued.  (Tr. 142:8-11).

When she and Ofc. Knick  approached the vehicle, she could see that it was packed with various items.  (Tr. 138:12-13).  She felt that it was an odd time for people to be asleep in a vehicle. (Tr. 137:17-18).  The Defendant was asked for identification which he provided.  (Tr. 140:12-15). She testified that the Defendant was not free to leave when he was first encountered. (Tr. 147:6-8). He was being detained for the purpose of investigating a suspicious vehicle. (Tr.134:5-10, 135:5-7). In her mind, this was not a traffic stop. (Tr. 141:1-7).  The Defendant was asked to step out of the vehicle.  (Tr. 141:19-21).  He did not appear to need any medical attention. (Tr. 142:3-5).  He was asked whether he had any weapons since Ward 2 is a high crime area and she always asks that question for her safety.  (Tr. 149:12-21).

## DISCUSSION

The Defendant argues that the Motion to Suppress should be granted on the following grounds: (1) his detention and arrest were unlawful; (2) there was no legal justification for the search of the vehicle; (3) any statements made were the product of the illegal detention and arrest; and (4) his statements were not freely and voluntarily made or were obtained in violation of Miranda.  The Government counters with the arguments that the stop was valid, the initial questioning and search

of the vehicle did not violate the Constitution, the detention was reasonable, and the Defendant's

statements were voluntarily made and not in violation of the <u>Miranda</u> warnings.

<u>(1) Whether the Stop and Detention the Defendant was Unlawful</u>

The Defendant argues that his Fourth Amendment rights were violated because the search of

his vehicle was unlawful.  Specifically, the Defendant argues that the officers searched the vehicle as

incident to an unlawful arrest.  The Government's brief argues that there was a valid traffic stop, and

therefore, the stop and detention were proper.  As the hearing progressed,  it became apparent that

the  investigation was not specifically related to a traffic stop, but instead an encounter initiated by

a police dispatch that a suspicious vehicle was parked at 2665 Lime Street. (Tr. 8:4-8).

Notwithstanding, the Fourth Amendment analysis of the detention and subsequent search is the same

whether the stop was made due to a traffic violation or an investigative encounter.

"It is well-settled that the Fourth Amendment prohibits 'unreasonable searches and seizures'

by the government, and its protections extend to brief investigatory stops of persons or vehicles that

do not amount to a full, traditional arrest." <u>U.S. v. Williams</u>, WL 1540287, *4 -5 (M.D. Fla. May 31,

2006) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 9, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968); <u>U.S. v. Cortez</u>,

449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed.2d 621 (1981). The Fourth Amendment is satisfied if

the officer's actions are supported by reasonable suspicion to believe that criminal activity "may be

afoot." <u>Terry</u>, 392 U.S. at 30. "Reasonable suspicion" is a less demanding standard than probable

cause and requires a showing considerably less than preponderance of the evidence. <u>Illinois v.</u>

<u>Wardlow</u>, 528 U.S. 119, 123-24, 120 S.Ct. 673, 145 L. Ed.2d 570 (2000).  However, the Fourth

Amendment requires at least a minimal level of objective justification for making the stop; the officer

must be able to articulate more than an "inchoate and unparticularized suspicion or hunch" of criminal

activity. Id. (citing U. S. v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed.2d 1 (1989); Terry, 392 U.S. at 27)); Cortez, 449 U.S. at 417.

In making a reasonable suspicion determination, the court must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. U.S. v. Arvizu, 534 U.S. 266, 273-74, 122 S. Ct. 744, 151 L. Ed.2d 740 (2002) (citing Cortez, 449 U.S. at 417-18). This process allows officers to draw on their own experience and specialized training to make inferences from, and deductions about, the cumulative information available to them that "might well elude an untrained person." Arvizu, 534 U.S. at 273-74 (quoting Cortez, 449 U.S. at 418, and citing Ornelas v. U.S., 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed.2d 911 (1996)).

In Terry v. Ohio, the Court adopted "a duel inquiry for evaluating the reasonableness of an investigative stop." U.S. v. Sharpe, 470 U.S. 675, 105 S. Ct. 1568, 84 L. Ed.2d 605 (1985); U.S. v. Acosta, 363 F.3d 1141, 1144 (11th Cir.2004). By this approach, the court examines "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Sharpe, 470 U.S. at 682. Whether an officer's actions were justified at the inception "turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime." Acosta, 363 F.3d at 1144-45. In the second part, the court looks to whether the stop was related in scope to the circumstances which justified the stop in the first place. Id.

### (a) Whether the Officers had Reasonable Suspicion to Make the Stop

The officers had a reasonable suspicion that a crime either had occurred or was about to occur.  The officers received a radio dispatch call regarding a suspicious vehicle parked in the roadway located at 2665 Lime Street. (Tr. 8:4-8).  Upon arrival at the scene, Ofc. Knick observed a white station wagon parked catty-corner along the curb with the rear of the vehicle protruding away from the curb into Lime Street in such a manner as to obstruct traffic in the westbound lane. (Tr. 10:15-24).  Ofc. Knick testified that the rear of the vehicle was parked approximately three feet from the curb and the front was approximately one foot away from the curb (Tr. 13:15-19).  After seeing the vehicle's position relative to the curb, Ofc. Knick believed the car was parked illegally. (Tr. 13:20-22).  Further, Ofc. Langton testified, in her experience as an officer, although the illegal parking violation was not the initial reason for her investigation,  the manner in which the vehicle was parked was a traffic violation. (Tr. 147:23-25, 148:1-14).

Ofcs. Knick and Langton approached the driver's side of the vehicle and made contact with the driver by knocking on the window. (Tr. 21:1-5).  Ofc. Knick testified that there were two (2) people sleeping in the vehicle. (Tr. 21:7-10).  Ofc. Knick testified the vehicle was "loaded down with T.V.'s [and] stereo equipment," which made him suspect the electronics might have been stolen.  (Tr. 21:16-19, 25:6-10).  Ofc. Langton testified the vehicle was suspicious to her because of the phone call dispatch they had received regarding the vehicle, the traffic violation, the electronics equipment packed into the vehicle, and the unusual circumstance of two people sleeping in a car on the side of the road at 9:00 am. (Tr. 148:25, 149:3-8).  Both officers testified that they were also concerned about the presence of the vehicle in a high crime area. (Tr. 25:6-12, 149:18-20).

Based upon the testimony of the officers, it is apparent they had a reasonable suspicion that a criminal activity had or was about to occur.   While an individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion of criminal activity, officers are not required to ignore the relevant characteristics of a location. Williams, WL 1540287, at *5.   Officers must consider the stop in the context of the totality of the circumstances and whether or not a stop occurred in a high crime area is a relevant factor in a Terry analysis. Id. Thus, given the phone call reporting a suspicious vehicle parked on Lime street, the electronics inside the car, the unusual circumstances surrounding two people sleeping in a car parked alongside of a road at 9:00 am, the high crime nature of the neighborhood, and the fact that the vehicle was protruding an estimated three (3) feet into Lime Street, Ofcs. Knick and Langton had sufficient reasonable suspicion to stop, and investigate the vehicle under Terry.

### (b) Whether the Detention Violated the Fourth Amendment

A search that is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope, and by reason of its duration.. See Terry, 392 U.S. at 18-19 (citing Kremen v. U.S., 353 U.S. 346, 77 S. Ct. 828, 1 L. Ed.2d 876 (1957); 19 Go-Bart Importing Co. v. U.S., 282 U.S. 344, 356-358, 51 S. Ct. 153, 75 L. Ed. 374 (1931)); Sharpe, 470 U.S. at 686. For a Terry stop to be valid, "it must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and the officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion." U.S. v. Simms, 385 F.3d 1347, 1353 (11th Cir.2004) (quoting Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed.2d 229 (1983)); U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir.2001). In assessing whether a detention is too long in duration to be justified as an investigative stop, it is appropriate for the court to examine whether the police

diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. Sharpe, 470 U.S. at 686. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." Id.

The Eleventh Circuit established a nonexclusive check list of four factors for the court to consider when reviewing whether or not the detention of a suspect was proper under Terry. In United States v. Acosta, the Eleventh Circuit stated the court should consider the law enforcement purposes served by the detention, the diligence with which the police pursued the investigation, the scope and intrusiveness of the detention, and the duration of the detention. 363 F.3d at 1146 (quoting U.S. v. Gil, 204 F.3d 1347, 1351 (11th Cir.2000)).

### (i) Purpose Served by the Defendant's Detention

Officers have the authority to perform a reasonable search for weapons for their protection in situations where the officer has reason to believe that he is dealing with an armed and dangerous individual. Terry, 392 U.S. at 26. The search of the vehicle and detention of the Defendant were initiated by the Defendant's statements that he had a knife in the vehicle. (Tr. 25:13-16). There is a particular danger to police officers conducting an investigative stop involving a motor vehicle. Holcy v. Flagler County, 2007 WL 2669219 * 3 (M.D. Fla. September 6, 2007). This is especially relevant in the instant case because the Defendant stated that he had a weapon in the vehicle. Thus, the immediate purpose of the detention became the safety of the officers and the general public.

*(ii) Officer Diligence*

After the Defendant informed Ofc. Knick that he had a weapon, Ofc. Knick asked the Defendant to step from the vehicle. (Tr. 25:13-24). Ofc. Langton then performed a protective sweep of the vehicle but did not locate the knife which the Defendant stated was under the driver's side seat. (Tr. 26:3-7, 27:1-2). Ofc. Langton approached the Defendant and asked him a second time if he had any weapons in the vehicle. (Tr.27:3-9). Ofc. Langton did not find the knife after a second sweep and asked the Defendant a third time if he had a weapon in the vehicle. (Tr. 27:10-19). The third time the Defendant mumbled what sounded like he had a gun in the vehicle. (Tr. 27:18-23). The officers then believed the Defendant possessed a concealed weapon which is a violation of Florida state law. (Tr. 28:18-25). Ofc. Knick searched the vehicle's interior while Ofc. Langton handcuffed and detained the Defendant in the patrol car. (Tr. 34: 8-25). Ofc. Knick's search of the Defendant's vehicle uncovered a shotgun underneath a pillow between the front seats. (Tr. 35:1-6). It is clear from the testimony that Ofc. Knick and Langton focused on the search for the weapon and diligently pursued that single purpose in their search.

*(iii) Intrusiveness of the Detention*

After the Defendant stated there was gun in the vehicle, Ofc. Langton handcuffed him and placed him in the back of the patrol car. (Tr. 29:7-16). Under the circumstances, Ofc. Langton had sufficient reasonable suspicion to detain and handcuff the Defendant. "Fourth Amendment jurisprudence has long recognized that the right to make an investigatory stop necessarily carries with it the right to use some degree of physical coercion to effect it." Holcy, 2007 WL 2669219 at * 3 (quoting Graham v Conner, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). In fact, the Eleventh Circuit has held that cuffing a suspect during a Terry stop is a reasonable action designed

-15-

to provide for the safety of the officers in cases where the officers reasonably believe their safety is threatened. Holcy, 2007 WL 2669219 *3 (citing U.S. v. Hastamorir, 881 F. 2d 1551, 1556-1557 (11th Cir. 1989)). In the instant action, the officers had reasonable grounds to believe their safety was threatened. They were involved with a vehicle investigation in a high crime area where the suspect admitted that he had a gun in the car. See Holcy, 2007 WL 2669219 at *3 (citing U.S. v Aldridge, 719 F.2d 368, 372 (11th Cir. 1983) (holding there is particular danger to officers when an investigation involves a suspect in a vehicle)).

### *(iv) Duration of the Detention*

The detention, in this instance, lasted approximately fifteen (15) minutes from the time Ofcs. Knick and Langton first approached the vehicle until the Defendant's arrest. (Tr. 38:10-25, 39:1-7). Courts have found that traffic stops that detain an individual between twenty to thirty minutes are reasonable. See U.S. v. Hardy, 855 F.2d 735, 757 (11th Cir. 1988) (holding that twenty eight minutes is not an unreasonable detention for a traffic stop); U.S. v. Williams, 784 F. Supp. 1553, 1559 (M.D. Fla. 1991) aff'd, 978 F.2d 721 (table) (11th Cir. 1992) cert. denied, 507 U.S. 946 (1993) (holding that a twenty minute detention for a traffic stop was reasonable).

The detention of the Defendant met the standards established by the Eleventh Circuit in Acosta. The detention was directly related to the officers investigation of the vehicle, and the Defendant's subsequent statement that he had a weapon in the vehicle. The scope of the search was limited to a search for the knife and then the gun the Defendant admitted he possessed in the vehicle. The Defendant was clearly detained for officer safety, and the length of the detention prior to the arrest was only fifteen (15) minutes. As a result, the Court respectfully recommends that there was sufficient reasonable suspicion to investigate, and subsequent justification to detain the Defendant.

### (2) Whether there was Legal Justification to Search the Vehicle

The Defendant argues that his Fourth Amendment rights were violated because the search of his vehicle was pursuant to an unlawful arrest. The Government states the officers had reasonable suspicion to believe the Defendant was armed and thus, had the right to search the vehicle for weapons. The officers had two valid reasons for searching the vehicle in this case. The Defendant informed the officers he had weapon in the vehicle and there was a second search incident to the arrest of the passenger Daye.

### (a) The Defendant Admitted He had a Weapon

It is well established that officers conducting a traffic stop may "take such steps as [are] reasonably necessary to protect their personal safety." U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing U.S. v. Hensley, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed.2d 604 (1985)). This includes conducting a protective search of the driver, Pennsylvania v. Mimms, 434 U.S. 106, 111, 112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the passengers, id., and the vehicle, Michigan v. Long, 463 U.S. 1032, 1049-51, 103 S. Ct. 3469, 77 L. Ed.2d 1201 (1983).
Ofc. Langton knocked on the driver's side window and asked the Defendant for identification. (Tr. 22:1-12). The Defendant provided them with a Florida ID card. (Tr. 23:10-14). At that point in time in the encounter, Ofc. Knick asked the Defendant if he had any weapons in the car. (Tr. 23:13-20). Ofc. Knick stated they asked if the Defendant had any weapon out of concern for officer safety. (Tr. 23:13-17). It is permissible for an officer to ask questions about guns or drugs while conducting a traffic stop. U.S. v Maxwell, 141 Fed. Appx. 878, 881 (11th Cir. 2005) (holding that it was reasonable for an officer to inquire if the driver had any weapons in the car in order to ensure the officers safety); Purcell, 236 F.3d 1279-1280.

The circumstances surrounding the investigation demonstrate that the officers were reasonable when they asked if the Defendant had any weapons in the vehicle.  There were two people in the vehicle with a blanket covering both individuals hands, and the vehicle was illegally parked in a high crime area. (Tr. 23:17-20).   When asked if he had any weapons in the vehicle, the Defendant responded that he had a knife under the seat. (Tr. 26:3-7, 27:1-2).  When Ofc. Langton could not find a knife and inquired further about weapons in the vehicle, the Defendant mumbled that he had a gun. (Tr. 27:18-23).  If an officer has a reasonable suspicion that a suspect is armed and dangerous, he or she may conduct a brief protective sweep of the suspects vehicle, so long as that search is constrained to places where a weapon may be hidden. Long, 463 U.S. at 1049.  It is clear, that Ofcs. Knick and Langton had a reasonable suspicion the Defendant was armed because of his statement that he had a weapon in the vehicle.  Thus, the resulting protective sweep which uncovered a shotgun between the front seats and a pistol under the passenger's seat was not a violation of the Fourth Amendment.

### (b) Search Incident to the Arrest of the Passenger Daye

Probable cause for a search exists when under the totality of the circumstances "there is a fair probability that contraband or evidence of a crime will be found in a particular place."U.S. v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002) (citing Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed.2d 527 (1983)). Ofc. Towler testified that she could see the passenger in the Defendant's vehicle digging on the floorboard for her purse, moving around attempting to hide something. (Tr. 84:6-9).  This drew Ofc. Towler's attention, and for officer safety she made sure that she was watching what the female did with her hands.  Given the circumstances of the investigative stop and the suspicious actions of Daye, it was reasonable for Ofc. Towler to believe that there was evidence of contraband or of a crime being concealed in the vehicle.

While Ofc.s Knick and Langton were engaged with the Defendant, Ofc. Towler asked Daye to step out of the vehicle and then asked whether or not she had any drugs or weapons on her. (Tr. 84:16-22). Ofc. Towler asked Daye if she could search her and her purse. (Tr. 85:1-5). Daye agreed to the search. (Tr. 85-1-3). Ofc. Towler searched Daye's purse and found what she knew in her training and experience to be a crack cocaine pipe. (Tr. 85:16-25, 86:1). Daye was placed under arrest for possession of drug paraphernalia. (Tr. 86:2-11).

The custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment, a search incident to the arrest requires no additional justification. Goddard, 312 F.3d at 1364. In fact, a full search incident to a lawful arrest is not only a "reasonable" search under the Fourth Amendment, it is also an exception to the warrant requirement. Id. Therefore, based upon the testimony of Ofc. Towler, it is clear that the search of the vehicle's interior was a search incident to a proper arrest.

### (3) Whether the Defendant's Statements were the Product of an Illegal Detention and Arrest

The Court has already determined that the detention of the Defendant was proper under Terry. The issue now is whether the ensuing arrest was illegal. Under the Fourth Amendment, an individual has a right to be free from "unreasonable searches and seizures." Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007). In Fourth Amendment terminology, an arrest is a seizure of the person, and the "reasonableness" of an arrest is, in turn, determined by the presence or absence of probable cause for the arrest. Id. (citing California v. Hodari D., 499 U.S. 621, 624, 111 S. Ct. 1547, 113 L. Ed.2d 690 (1991)). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." U.S. v. Floyd, 281 F.3d 1346, 1348 (11th

Cir.2002) (per curiam) (quotation marks omitted). This probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances. *See* Maryland v. Pringle, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

The Defendant told Ofcs. Knick and Langton that he had a knife in the vehicle. (Tr. 25:13-18). Ofc. Langton looked under the seat but did not locate a knife. (Tr. 27:1-9). During his search of the vehicle, Ofc. Knick found a shotgun between the seats. (Tr. 35:4-6). He informed Ofc. Langton of the presence of a gun, took possession of the shotgun and cleared it. (Tr. 35:7-10). It was unloaded. (Tr. 35:19-21). Ofc. Towler took possession of the revolver found under the passenger seat. (Tr. 35:24). After determining the Defendant was a convicted felon, the Defendant was placed under arrest for Possession of a Firearm by a Convicted Felon. (Tr. 37:1-6). Ofc. Knick had the facts and circumstances within his knowledge sufficient to warrant a reasonable belief that the Defendant had committed a crime. Therefore, the arrest was legal and complied with the requirements of the Fourth Amendment.

### *(4) Whether the Defendant's Miranda Rights were Violated*

The Defendant argues that he made statements after he was detained and prior to the search of the vehicle that were not preceded by a reading of Miranda. The Defendant further asserts that during his interview, which was tape recorded, it is not clear whether there was a legally sufficient reading of the Miranda warnings.

### *(a) PreArrest Statements*

A person need only be informed of his Miranda rights if he is in custody and is being interrogated. Miranda v. Arizona, 384 U.S. 436, 478-479 (1966). Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444. The Supreme Court

defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 300-301, 110 S. Ct. 1682 (1980).

While a person is not free to leave during a Terry stop – Terry stops are not subject to the dictates of Miranda. Acosta, 363 F.3d at 1148.  The Supreme Court in Berkemer v. McCarty, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed.2d 317 (1984), explained that the non-threatening nature of a Terry stop is the reason for "the absence of any suggestion in [the Court's] opinions that Terry stops are subject to the dictates of Miranda."  Acosta, 363 F.3d at 1148.  Furthermore, with the stop occurring in a high crime area, the presence of two people sleeping in a vehicle full of electronic equipment,  and the Defendant's and passenger's hands being obscured under a blanket, the officers were clearly justified in asking the Defendant if he had a weapon in the vehicle. See Holcy, 2007 WL 2669219 at *3 (citing U.S. v Aldridge, 719 F.2d 368, 372 (11th Cir. 1983) (holding there is particular danger to officers when an investigation involves a suspect in a vehicle);  Maxwell, 141 Fed. Appx. at 881 (holding that it was reasonable for an officer to inquire if the driver had any weapons in the car in order to ensure the officer's safety).   Therefore, the officers questions regarding weapons in the vehicle did not violate the Defendant's Miranda rights.

Having found the officers did not violate the Defendant's Fifth Amendment rights by inquiring if he had any weapons, the Court must now determine if the Defendant's answers were freely and voluntarily made.  After Ofcs. Knick and Langton made contact with the Defendant and asked the Defendant for his ID, Ofc. Knick asked him if he had any weapons in the car. (Tr. 23:  13-15).  The Defendant told Ofc. Knick he had a knife under the front seat. (Tr. 25:13-18).  When Ofc. Langton could not find the knife, she asked him again if he had any weapons. (Tr. 27:4-12).  Finally, the third

time when Ofc. Langton asked the Defendant whether he had any weapons in the vehicle, the Defendant mumbled something about a gun. (Tr. 27:8-23).  The Defendant then clarified that he had a cap gun under the front passenger's seat. (Tr. 28:1-2).

During this time, the Defendant was not handcuffed, was not under arrest, no one held a gun on him while they questioned him, nor were any K-9 units called to the scene. (Tr. 26:12-21, 30:4-25, 31:1-6).  After the Defendant stated he had a gun, Ofc. Langton handcuffed him and placed him in the back of the patrol car, however, he was still not under arrest. (Tr. 29:3-12).  Thus, it is clear that the Defendant made purely voluntary responses to Ofc. Knick and Ofc. Langton's questions.  Purely voluntary statements made by a defendant such as the Defendant's comment, "I have a knife",  are not barred by Miranda. 384 U.S. at 478.  Consequently, his statements should not be suppressed.

<u>(b) Post Arrest Miranda Statements</u>

The Defendant asserts there was no proof provided that he was given a legally sufficient reading of his Miranda rights when he was arrested nor at the time he gave his formal tape recorded statement at the police station. However, in both cases the Defendant was read his rights by the investigating officer and made voluntarily statements after waiving his rights. The Defendant argues that during the interview he indicated "he was not giving up his rights" and that was an indicator he was invoking his right to remain silent or, at the very least, he did not understand his rights. However, when invoking his Miranda rights, a Defendant must make an unequivocal statement with sufficient clarity so that a reasonable police officer would understand that statement to be an assertion of the right to remain silent.  U.S. v. Racca, 2007 WL 3032512, *3 (11th Cir. October 18, 2007).  If the statement is ambiguous or equivocal, the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation." Id. (citing U.S. v. Mikell, 102 F.3d 470, 476 (11th

Cir.1996). (citation omitted)).  Thus, "[t]he government has no duty to cease interrogating a suspect where the suspect's invocation of his <u>Miranda</u> rights is equivocal." <u>Racca</u>, 2007 WL 3032512, at *3 (citing  <u>U.S. v. Dowd</u>, 451 F.3d 1244, 1250 (11th Cir.2006) (quotation omitted)).

Ofc. Knick testified that he read the Defendant his <u>Miranda</u> rights from the laminated card given to all officers by the FMPD. (Tr. 39:12-25, 40:1-24).  Ofc. Knick then asked the Defendant if he would answer his questions, and the Defendant "said he would talk." " He implied that he would answer our questions." (Tr. 40:25, 41:1-5).

When asked if he understood his rights, the Defendant replied "right." (Tr. 41:8-10).  The Defendant then agreed to talk to the officers. (Tr. 41:11-13).  Ofc. Knick testified the Defendant stated the revolver found under the passenger's side seat was his and the shotgun was given to him. (Tr. 42:15- 25, 43:1-24).  Thus, it is clear that Ofc. Knick properly Mirandized the Defendant prior to questioning him after his arrest.

The Defendant was also interviewed by Det. Murphy.  Det. Murphy asked the defendant routine booking questions prior to going on tape, turned the tape recorder on, and read the Defendant his <u>Miranda</u> rights from a prepared form. (Tr. 112:12-24); (Govt. Ex. #4).  Det. Murphy read the section of the form dealing with the Defendant's rights, and read the Defendant the portion of the form dealing with the issue of waiver of those rights.  (Tr. 124:6-8).  The Defendant signed the form as did Det. Murphy.  (Tr. 113:10-21).  He advised that he did not threaten or coerce the Defendant into waiving his rights.  (Tr. 118:11-23).

After Det. Murphy read the Defendant his <u>Miranda</u> rights, the Defendant stated "[u]h just, uh just talk to you okay. I'm not giving up my rights or nothin', right?" (Gov't Ex # 3, p. 3).  The interview continued as follows:

Murphy: "Well Cedric you know, you, you, have the right to remain silent . . . you have the right to . . ."

Farmer: "I know that . . ."

Murphy: "you have all those rights . . ."

Farmer: "I know, I know this . . . I know that procedure . . ."

Murphy: "Okay I'm going to ask you questions about what happened today."

Farmer: "Oh okay."

Murphy: "If you want to talk to me about this . . ."

Farmer: "No problem, look, look . . . I did nothin' wrong . . .and then you . . ."

Murphy: "And you know, you know if you don't want to talk to me that's fine we'll stop.."

Farmer: "Okay."

Murphy: ". . . and you know you can stop talking to me at anytime you want. Okay?"

Farmer: "unintelligible . . ."

(Govt' Ex 4, p. 3).  The interview continued from that point.

In this case, it is clear the Defendant wanted to continue the interview. Det. Murphy took several precautions to make sure the Defendant understood his rights, and understood that he could stop the interview at any time.  It is clear  the Defendant understood his right to remain silent, and that he continued to freely speak with Det. Murphy.  Thus, the totality of the circumstances indicates that the Defendant made a knowing and intelligent waiver of his right to remain silent.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Defendant Cedric Farmer's Motion to Suppress Evidence and Memorandum of Law (Doc. #21) should be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this    18th    day of March, 2008.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record